UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THOMAS RAY FLEMING, an individual,<br><br>      Plaintiff,<br><br>      v.<br><br>CITY OF BOISE a municipality and/or political subdivision of the State of Idaho,<br><br>      Defendant. | Case No. 1:22-cv-00519-BLW-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court is Defendant's Motion for Summary Judgment. The Court heard oral argument on August 19, 2024, and now issues its decision. For the reasons described below, the Court will grant the Motion.

## BACKGROUND

Plaintiff Thomas Ray Fleming brought this lawsuit against the City of Boise for violation of the Idaho Protection of Public Employees Act (IPPEA), Americans with Disabilities Act (ADA), Age Discrimination in Employment Act (ADEA), and Idaho Human Rights Act (IHRA). Fleming worked for the City of Boise Police

Department from 2005 to 2022, after over a decade with the Twin Falls City Police. In March 2021, he was promoted to the rank of Captain and appointed to lead the Professional Standards Division, where he oversaw internal investigations. He retired in July 2022 at the age of fifty-three. *Aff. of Thomas Fleming* ¶¶ 3-5, Dkt. 39. Fleming claims that his retirement was really a constructive discharge motivated by his (1) participation in investigations of the Chief of Police and other City employees; (2) disability and exercise of rights under the ADA; and (3) age. *Am. Compl.* ¶¶ 23-42, Dkt. 1.

Though the parties dispute certain facts, they generally agree on the key events. Fleming's job was an office-based position supervising Internal Affairs. He reported to Chief of Police Ryan Lee and Deputy Chief Tammany Brooks. In July and August 2021, Fleming oversaw an internal investigation of Officer Tim Green, who was involved in a fatal shooting while off-duty on a camping trip. Fleming developed doubts about Green's truthfulness and fitness for duty based on evidence that Green had lied about having a firearm on him at the time of the shooting. At a meeting in mid-August, Fleming recommended to Chief Lee that Green be placed on administrative leave. Lee disagreed and was more concerned with an investigator's failure to initially provide Green with *Garrity* warnings. The meeting grew hostile, and Lee kicked Fleming out of his office. *See Def.'s Statement of Material Facts* ¶ 7, Dkt. 34; *Aff. of Thomas Fleming* ¶¶ 7-14, Dkt. 39.

Approximately two months later, in October 2021, Fleming became involved in a misconduct investigation into Lee himself, who was accused of assaulting and battering Sergeant Kirk Rush. The incident occurred at a department briefing where Lee used Rush to demonstrate a use-of-force technique that involved placing Rush in a neck hold and pulling him around the room. Fleming was not at the meeting, but multiple employees including Rush approached him afterwards. Rush eventually decided that he wanted to file a criminal complaint against Lee. Due to the internal conflict of interest, Fleming referred the investigation to another agency. Lee remained on active duty, which caused concern among some department employees. *See Def.'s Statement of Material Facts* ¶ 8, Dkt. 34; *Aff. of Thomas Fleming* ¶¶ 15-21, Dkt. 39.

Shortly after that, in November 2021, Fleming underwent full knee-replacement surgery to address persistent and chronic pain that impaired his daily mobility. He returned to the office approximately two weeks after the surgery. At a meeting with Lee a week or two later, Lee made comments about Fleming's age and injury. Asked to recall the comments, Fleming explained:

> [Chief Lee] said that people had been coming to his office and were concerned about my ability to make it to retirement age because I was limping around the station, and it looked like I was in pain and just referred it basically as, Can you do the job? And I assured him that I was fine to do the office work that was required and the job I was doing before. But, yes, I was still recovering, and I still was in pain, and I was limping around. I was still going to physical therapy, you know.

**MEMORANDUM DECISION AND ORDER - 3**

*Def.'s Statement of Material Facts* ¶ 10, Dkt. 34 (alteration in original).

Over the next several months – the specific timing is unclear[1] – Fleming heard two other remarks about his age and recovery from the knee replacement. One comment occurred at meeting where Fleming and Lee discussed succession planning. Lee then asked: "How are you feeling physically?" and "how much longer are you planning on staying here?" Fleming replied that he planned to work a couple more years. *See Aff. of Thomas Fleming* ¶ 32, Dkt. 39; *Def.'s Statement of Material Facts* ¶ 15, Dkt. 34. Several weeks later, Deputy Chief Brooks, likewise asked Fleming, "How much longer are you intending to stay on?" *Aff. of Thomas Fleming* ¶ 33, Dkt. 39.

During this time, the Boise Police Department continued to experience turmoil related to Lee's criminal investigation, especially when the story began attracting press attention. By February 2022, a number of department employees had attempted to file complaints with the City of Boise's human resources department. The City, however, rerouted the complaints to either Internal Affairs –

---

[1] Fleming appears uncertain about the precise timing, and the record is somewhat inconsistent. In deposition, Fleming stated that both comments occurred between December 2021 and March 2022. *Dec. of Erika Judd, Ex. A* at 53:1-8, Dkt. 34.  In his later affidavit, Fleming suggested that they took place in April 2022, following the release of an Office of Police Accountability memo recommending that Lee be placed on leave. *Aff. of Thomas Fleming* ¶ 32, Dkt. 39.

which fell under Lee's authority – or to the Office of Police Accountability (OPA). At the end of February, Fleming was interviewed by OPA Director Jesus Jara as part of the OPA's investigation into Lee. At the interview, Fleming complained of a hostile work environment and expressed feelings of hopelessness. In early April, the OPA recommended that the City place Lee on administrative leave until the completion of the investigation. *See Def.'s Statement of Material Facts* ¶ 16, Dkt. 34; *Aff. of Thomas Fleming* ¶¶ 23-31, Dkt. 39.

That month, another dispute arose between Lee and Fleming. Lee had required all officers to complete a human rights training, and he told Fleming that anyone who failed to do so by the deadline should be found insubordinate. Fleming learned that an African American officer, who previously worked with Lee in Portland, had not done the training. The officer also falsely stated that he did not receive the email in time, a claim contradicted by electronic tracking. After consulting with Deputy Chief Brooks, Fleming initiated an investigation for insubordination and untruthfulness. *Aff. of Thomas Fleming* ¶¶ 34-35, Dkt. 39.

Lee then confronted Fleming about the investigation. According to Fleming, Lee raised his voice and said, "Who the hell are you to write somebody up for insubordination?" When reminded of his instructions, Lee "just sneered." *Id.* ¶ 36. Fleming also informed Lee about the officer's apparent lie. In response, Lee said of the investigation, "This is a racist act." *Id.* ¶ 37; *Def.'s Statement of Material Facts*

¶ 18, Dkt. 34. Lee also claimed that Fleming's friend, Captain Mike Ruffalo, had engaged in a "racist act" by denying terminal leave to an African American officer preparing to retire, normally a standard practice in the department. Fleming saw this accusation of racism as a "final straw" and believed that Lee was intent on destroying Fleming's reputation. *Aff. of Thomas Fleming* ¶ 38-39, Dkt. 39.

Fleming began losing sleep and experiencing other physical manifestations of stress. Though he had planned to stay in his role until 2024, he me met with employees at the Public Employee Retirement System of Idaho (PERSI) about the possibility of early retirement. He also informed Ruffalo about Lee's accusation of racism, and the two of them met with Brooks. At the meeting, Fleming confided that he was looking into early retirement, and Brooks replied that he "hated to hear that." *Id.* ¶¶ 41-44.

A few days after that conversation, Fleming met with Lee about an unrelated internal investigation. They had a disagreement about how to handle it, and Lee stated, "This is the way we are going to do it and if this gets to be too much for you, you can go down to PERSI and look at retiring." Later that day, after meeting to discuss another internal issue, Lee reiterated, "Remember, if this gets to be too much for you to handle, you can always go down to PERSI and look into retirement." *Id.* ¶ 45-46; *Def.'s Statement of Material Facts* ¶ 19, Dkt. 34.

The next morning, Lee asked Fleming to prepare talking points for a meeting

with the City Council about the department's hiring practices. Fleming turned in the talking points in the afternoon and verbally explained the content. According to Fleming, Lee replied, "Or I can do whatever the hell I want to." Lee then said, "Remember, if this all gets to be too tough for you, you can always go to PERSI and look at retirement." *Aff. of Thomas Fleming* ¶ 48, Dkt. 39; *Def.'s Statement of Material Facts* ¶ 21, Dkt. 34.

In early May 2022, Fleming learned that the City would not follow OPA's recommendation to place Lee on leave and that the investigation was being closed. Fleming decided that the workplace was no longer tolerable. On June 16, he announced that he would be retiring effective July 15, seven months prior to the date that he was eligible for full retirement benefits.[2] A few days after the announcement, he told a friend that he had accepted a new position at Boise State University, which he described as "too good to pass up." *Def.'s Statement of Material Facts* ¶ 29-32, Dkt. 34.

A month or two after retiring, Fleming spoke with journalists from KTVB at the urging of another former police captain. KTVB broke the story about Lee in September 2022, and the City of Boise almost immediately announced his

---

[2] This reflects the "Rule of 80," which allows public safety officers to receive unreduced retirement benefits if their age plus years of service equals eighty. *Def.'s Statement of Material Facts* ¶ 26, Dkt. 34. Officers retiring prior to that date can, under some circumstances, either "buy" additional months of service or accept reduced benefits.

termination. *Aff. of Thomas Fleming* ¶¶ 2-3.

In October 2022, the City replaced Fleming with Jeff Niiya, who was forty-eight years old when he began the job – five years younger than Fleming's age at retirement. Niiya transferred from an out-of-state police department, meaning that he would not be eligible for early retirement for at least sixty months. *Pl.'s Statement of Disputed Facts* ¶¶ 2-3, Dkt. 39.

Fleming filed suit in November 2022 in Idaho's Fourth Judicial District, arguing that he was constructively discharged because the City effectively forced him quit through its intolerable and discriminatory working conditions. Specifically, he alleged that the City retaliated against him for whistleblower activity protected under the IPPEA and engaged in age and disability discrimination in violation of the ADA, ADEA, and IHRA. The City of Boise removed the case to this Court and now seeks summary judgment on each claim.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a). A principal purpose of summary judgment "is to isolate and dispose of factually unsupported claims" and thereby prevent these matters "from going to trial with the attendant unwarranted consumption of public and private resources." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 327

(1986). Accordingly, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). Rather, the dispute must concern a material fact – one "that may affect the outcome of the case." *Id.* at 248.

Only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir.2002). The evidence must be viewed in the light most favorable to the non-moving party, and Court must not make credibility findings. *Anderson*, 477 U.S. at 255. The Court, however, is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence but may simply point out the absence of evidence to support the non-moving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000). The burden then shifts to the non-moving party to produce evidence sufficient to support a favorable jury verdict. *Deveraux*, 263 F.3d at 1076. The non-moving party must show by "affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material

fact exists. *Celotex*, 477 U.S. at 324. This requires directing the Court's attention "to specific, triable facts," and the Court "is not required to comb through the record to find some reason to deny a motion for summary judgment." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885 (9th Cir. 2003).

## ANALYSIS

### 1. Constructive Discharge

A threshold question central to each of Fleming's claims is whether he suffered adverse employment action as a result of his protected activity or status. Here, the only adverse employment identified by Fleming is his claim that he was constructively discharged because of intolerable working conditions.  Even after construing the evidence in a light most favorable to Fleming, the Court is unpersuaded that his claim of constructive discharge can survive summary judgment.

Constructive discharge occurs when an employee reasonably decides to resign "because of unendurable working conditions." *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007). This is an objective standard, and conditions must have deteriorated "to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Id.* (quoting *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir.

2000)). Though constructive discharge is normally a question of fact for the jury, "a single isolated incident" is usually insufficient as a matter of law. *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1411-12 (9th Cir. 1996). A plaintiff thus "must show some aggravating factors, such as a continuous pattern of discriminatory treatment." *Id.*

As evidence of constructive discharge, Fleming identifies eight specific hostile incidents over the course of about eight months, plus broader climate problems at the police department under Lee's leadership. In August 2021, Lee grew angry and kicked Fleming out of his office during a discussion of the investigation into Officer Green. Then there were three remarks about Fleming's surgery and retirement plans between December 2021 and April 2022. In late April, Lee also yelled at Fleming and accused him of "a racist act." At this point, Fleming began considering early retirement. Lee apparently soon learned of Fleming's inquiries at PERSI and made three comments in two days encouraging him to retire. More broadly during this time, Lee was the subject of both an OPA investigation and a criminal complaint, but the City would not place him on leave. Fleming apparently concluded that he could not perform his job responsibilities with integrity given the City's intransigence. He announced his retirement more than a month later, in mid-June, and remained in his position until mid-July.

As a matter of law, the eight incidents, standing alone, do not amount to

constructive discharge. Aside from Lee's hostility and alleged misconduct, Fleming has not described any change at all to his working conditions. His compensation did not change. He remained in the same office working the same hours. He maintained the same responsibilities and authority, albeit marked by frequent disagreements with his supervisor.

The Ninth Circuit Court of Appeals has rejected constructive discharge claims based on facts notably more concerning than the collection of comments presented here. For example, in *Poland*, the court determined that a customs supervisor was not constructively discharged after years of remarks about his age followed by a transfer to a nonsupervisory position on the other side of the country. 494 F.3d at 1184-85. Similarly, in *Schnidrig*, summary judgment on a constructive discharge claim was appropriate even though the employee had been replaced in a leadership position by a significantly younger person, moved to a smaller office, excluded from important meetings, and denied a pay raise that another employee at a similar level received. 80 F.3d at 1411-12. Conversely, the claims that that have succeeded have involved facts that are truly egregious. In *Parrett v. City of Connersville*, for instance, a police officer was stripped of all job responsibilities – though he retained his pay – and forced to spend his shifts alone in a small windowless room with no telephone. 737 F.2d 690, 693-94 (7th Cir. 1984).

Fleming contends that special consideration should be given to his role as

Captain of the Professional Standards Division. Even if we assume that the City was "covering up" misconduct by the Chief of Police, as Fleming alleges, such actions, by themselves, would not constitute unendurable working conditions. Fleming, himself, was not required to engage in unethical behavior. Rather, he simply had a strongly held belief that the City and its Police Department were acting unethically. Fleming has not cited, and the Court has been unable to find, any case holding that a disagreement over the propriety of an employer's conduct, where the employee was not required to act unethically, can amount to intolerable working conditions necessary to support a claim of constructive discharge.

The dearth of case law covering these facts is due, in large part, to the requirement on each of Fleming's claims, that he not only experienced a hostile work environment, but that there be a causal connection between his protected activity or status and the hostile work environment which led to his constructive discharge. These requirements apply to each of Fleming's statutory causes of action. *See Wright v. Ada County*, 376 P.3d 58, 63 (Idaho 2016) (IPPEA causation); *Braunling v. Countrywide Home Loans, Inc.*, 220 F.3d 1154, 1156 (9th Cir. 2000) (ADA causation); *Gross v. FBL Financial Servs.*, 557 U.S. 167, 180 (2009) (ADEA causation). Simply put, there is no such causal connection. The City and Police Department's alleged lack of concern over unethical behavior may have triggered Fleming's whistleblower activities. But, that *preceded* his

**MEMORANDUM DECISION AND ORDER - 13**

complaints, and his complaints could not have triggered the City's ethical indifference which Fleming says compelled his resignation. Likewise, they *preceded* the conduct which allegedly reflected the Police Department's age and disability discrimination, and his complaints could not have caused the City to ignore the ethical concerns that Fleming found so alarming.

In summary, all of Fleming's claims fail because of the lack of any adverse employment action caused by his protected activities or status. Therefore, the Court will only briefly discuss the specific shortcomings of each of those claims.

### 2. Idaho Protection of Public Employees Act

Fleming's first claim is for retaliation under the IPPEA, also known as the Whistleblower Act. The law seeks "to protect the integrity of government by providing a legal cause of action for public employees who experience adverse action from their employer as a result of reporting waste and violations of a law, rule or regulation." Idaho Code § 6-2101. It applies to a public employee who (1) "communicates in good faith the existence of any waste of public funds, property or manpower, or a violation or suspected violation of a law, rule or regulation"; (2) "participates or gives information in an investigation, hearing . . . or other form of administrative review"; or (3) "has objected to or refused to carry out a directive that the employee reasonably believes violates a law or a rule or regulation." *Id.* § 6-2104.

To prevail on an IPPEA claim, a plaintiff must establish three elements: "(1) he was an 'employee' who engaged or intended to engage in protected activity; (2) his 'employer' took adverse action against him; and (3) the existence of a causal connection between the protected activity and the employer's adverse action." *Wright v. Ada County*, 376 P.3d 58, 63 (Idaho 2016). Here, there are clearly disputed issues of fact as to whether Fleming engaged in protected activity. But, as explained above, Fleming's claim fails because of the lack of any adverse employment action causally related to his protected activity.

### 3. Disability Discrimination Under the ADA

To obtain relief under the ADA, Fleming must show that he (1) "is a disabled person within the meaning of the statute"; (2) "is qualified, with or without reasonable accommodation, to perform the essential functions of the job"; and (3) "suffered an adverse employment action because of [his] disability." *Braunling v. Countrywide Home Loans, Inc.*, 220 F.3d 1154, 1156 (9th Cir. 2000). Fleming qualifies as a disabled person under the ADA, but he has not established a material question of fact regarding adverse employment action and causation.

### A. Status as a "Disabled Person"

A person is considered disabled under the ADA if he (A) has "a physical or mental impairment that substantially limits one or more major life activities"; (B) has "a record of such an impairment"; or (C) is "regarded as having such an

impairment." 42 U.S.C. § 12102(1). These definitions are broadly construed in favor of coverage, and the determination of whether an individual has a qualifying impairment is made "without regard to the ameliorative effects of mitigating measures." *Id.* § 12102(4)(A), (E)(i).

Fleming's knee replacement surgery in itself would not necessarily be a qualifying physical impairment under the ADA given how quickly he recovered. But the need for the surgery arose, in his words, from "a chronic musculoskeletal condition." *Pl.'s Opp'n* at 23, Dkt. 39. He had a previous knee surgery to address the same problem, and he has testified that chronic pain impaired his ability to perform major life activities like walking, running, exercising, lifting things, and using stairs. *Aff. of Thomas Fleming* ¶ 22, Dkt. 39. This meets the ADA's broadly construed definition of disability.

For similar reasons, Fleming meets the definition of disabled under the "regarded as" prong of the ADA based on evidence that Chief Lee viewed him as impaired after the surgery. On this issue, the City argues that Fleming only had a "transitory and minor" impairment, which is excluded from coverage under this provision of the ADA. *See* 42 U.S.C. § 12102(3)(B). As a sister district court recently explained, an employee is not considered disabled under the "regarded as" prong "if the employee's actual impairment lasted less than six months." *Bledsaw v. McGeorge Contracting Co.*, No. 4:23-cv-00358, 2024 WL 1385920, at *3 (E.D.

Ark. Mar. 30, 2024). At first glance, this would seem to disqualify Fleming because he returned to work, with full responsibilities, only a few weeks after the knee replacement surgery. But Fleming's knee problems existed for years before that surgery, meaning that the impairment was not actually transitory and minor. The fact that the surgery itself had a quick recovery timeline does not negate this longer history.

### B. Adverse Action "Because of" Disability

Though Fleming qualifies as a disabled individual under the ADA, he has not established a triable question of fact for the causal relationship between his disability and any adverse employment action. In addition to the preceding discussion of constructive discharge, Fleming's claim fails because of a lack of any causal relationship between his disability and the conduct he points to as creating an adverse employment action. A plaintiff in an ADA discrimination claim "must show that the adverse employment action would not have occurred but for the disability." *Murray v. Mayo Clinic*, 934 F.3d 1101, 1105 (9th Cir. 2019). As explained above, causation is usually a question of fact for the jury. But Fleming must provide some evidence to survive summary judgment, and he has not met that burden on his disability claim.

Of the eight incidents that Fleming describes, only two had any plausible connection to his disability. The first was in December 2021 shortly after

Fleming's return to the office, when Lee said something to the effect of "people have come to me and have seen you limping around the office, and are concerned you are not going to make it to retirement age." *Aff. of Thomas Fleming* ¶ 30, Dkt. 39. The second occurred between January and April 2022. There, Lee stated, "How are you feeling physically? I know you've had a few surgeries lately." He then asked Fleming, "How long are you planning on staying here?" *Id.* ¶ 32.

If Fleming had left the job immediately after the second conversation, these two incidents would still be paltry basis for an inference of causation. But Fleming did not announce his retirement until at least two months after the second comment – and possibly as long as six months given the uncertainty of the timing. At the summary judgment stage, the Court is not required to accept unreasonable inferences from the factual record. *McLaughlin*, 849 F.2d at 1208. Fleming has not presented evidence that would allow any reasonable jury to find a causal relationship between the knee impairment and his alleged adverse employment action. Even if Fleming had established a question of fact for constructive discharge, this is one of the relatively rare instances where the Court must perform its gatekeeping function on a question of causation. Therefore, summary judgment is granted on Fleming's ADA claim.

### 4.  Age Discrimination

Fleming's age discrimination claims under the ADEA also fails as a matter

of law. The ADEA prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To make a prima facie claim under the ADEA, a plaintiff must meet four requirements: (1) he was at least forty years old; (2) his job performance was satisfactory; (3) he was discharged; and (4) he was "either replaced by a substantially younger employee with equal or inferior qualifications or discharged under circumstances otherwise giving rise to an inference of age discrimination." *Sheppard v. David Evans & Assoc.* 694 F.3d 1045, 1049 (9th Cir. 2012) (emphasis and alterations omitted).

The first two factors are uncontested: Fleming was over forty when he left the job, and the City accepts for purposes of this Motion that he was performing satisfactorily. For the third factor, Fleming has failed to establish sufficient evidence of constructive discharge, as described above. His allegations also fall short on the fourth factor because his replacement was only five years younger than him.

The Ninth Circuit Court of Appeals has indicated that an age difference should be at least ten years to qualify as "substantial." In *Diaz v. Eagle Produce Ltd.*, the court explained that a disparity of approximately 9.5 years "is not so stark as to suggest bias rather than pure chance." 521 F.3d 1201, 1209 (9th Cir. 2008). A difference of sixteen years, on the other hand, supported an inference of

discrimination. *Id.* at 1210; *see also Harley v. Wis. Bell, Inc.*, 124 F.3d 887, 893 (7th Cir. 1997) (requiring replacement employees to generally be at least ten years younger to create a presumption of age discrimination). While the court did not explicitly draw a bright line at ten years, *Diaz* clearly cautions against recognizing a difference of merely five years as "substantial" under the ADEA.

Fleming insists that a five-year difference is substantial here because his replacement would not vest in the PERSI retirement system for a significant period of time. *Pl.'s Opp'n* at 20-21, Dkt. 39. Under the "Rule of 80," a police officer can receive full retirement benefit when his age plus years of service is equal to eighty. *Def.'s Statement of Material Facts* ¶ 26, Dkt. 34. Fleming's replacement transferred from out-of-state, meaning that he would be eligible for full retirement benefits at an older age than Fleming, who had spent more than fifteen years with the Boise Police Department.

But the intricacies of PERSI retirement policies do not render an otherwise trivial age difference substantial. Under Fleming's proposed standard, he would have a viable ADEA claim even if his replacement were a mere day younger than him, provided that it would take longer for the replacement to vest in PERSI. This outcome is both nonsensical and contrary to the U.S. Supreme Court's instruction that "an inference [of age discrimination] cannot be drawn from the replacement of one worker with another worker insignificantly younger." *O'Connor v. Consol.*

*Coin Caterers Corp*, 517 U.S. 308, 313 (1996).

In short, Fleming was not replaced by a substantially younger employee because his replacement was only five years younger – and, at forty-eight, himself a member of the ADEA protected class. Because of this and the failure to establish constructive discharge, Fleming has not made a prima facie case for age discrimination under the ADEA. Summary judgment must be granted for the City on this claim.

### 5. Idaho Human Rights Act

Finally, Fleming has brought a claim of age and disability discrimination under the IHRA. The IHRA sets out state anti-discrimination policies that mirror the protections of the federal Civil Rights Act of 1964, the ADA, and the ADEA. Idaho Code § 67-5901. The Idaho Supreme Court has held that federal precedent governs the scope of IHRA protections. *See Hatheway v. Bd. of Regents of the Univ. of Idaho*, 310 P.3d 315, 322 (Idaho 2013); *Stansbury v. Blue Cross of Idaho Health Serv., Inc.*, 918 P.2d 266, 269 (Idaho 1996). Fleming's action under the IHRA thus fails for the same reasons that his arguments under the ADA and ADEA fail. Therefore, summary judgment is granted for the City on this claim.

# ORDER

**IT IS ORDERED that:**

1. Defendant's Motion for Summary Judgment (Dkt. 34) is **GRANTED.**

DATED: November 4, 2024

B. Lynn Winmill
U.S. District Court Judge